APPEAL OF HARTFORD & CONNECTICUT WESTERN RAILROAD CO.

Docket No. 2021. Submitted May 27, 1925. Decided June 30, 1925.

1. Where A corporation owns 99.9 per cent of the stock of B corporation, their interests are closely affiliated, and the relation between B and C corporation by contract applies to A.

2. The relation of lessor and lessee is not sufficient to establish affiliation under section 240, Revenue Act of 1918.

3. Where the lessee owns a majority of the lessor's stock and the minority does not appear or vote at meetings and the lessee by contract is in complete control of all the lessor's business and properties, leaving to the minority stockholder only the right to dividends declared out of rental, the two corporations are affiliated.

*O. R. Folsom-Jones, Esq.*, for the taxpayer.
*Percy S. Crewe, Esq.*, for the Commissioner.

Before STERNHAGEN, GREEN, and LOVE.

### FINDINGS OF FACT.

During 1918 the New Haven owned 17,482 shares out of a total outstanding of 29,670 shares of common stock of the taxpayer, being 58.9 per cent of the total outstanding stock. When the taxpayer's stock books were closed on August 21, 1917, there were 579 shareholders, and on August 21, 1918, there were 570. At the annual stockholders' meeting on June 11, 1917, there were represented 17,525 shares, and on June 10, 1918, there were 17,796. At both these meetings the total 17,482 New Haven shares were represented—more than 99 per cent of the active stock. The corporate officers of the taxpayer were officers of the New Haven and the Central New England Railway Co., hereinafter called the New England, of which the New Haven owned 99.9 per cent of the total outstanding stock. The directors of the taxpayer were officers of the New Haven and the New England.

By virtue of a contract, sometimes called a lease, the New England was in possession of and operated the properties of the taxpayer as an integral part of the transportation system of the New Haven. This contract was executed in 1890 with a predecessor of the New England and was ratified by more than two-thirds of the taxpayer's stockholders at that time. By its terms the taxpayer " leased " all its railroad and all its other property, real and personal, of every kind, including its railroad operating income, and excepting its records, account books, and its seal. The term was fifty years. The annual rent was $2 per share of the taxpayer's capital stock at any time outstanding, payable semi-annually on a day certain, and also the interest on bonds of the taxpayer then or thereafter issued.

And the lessee further covenants with the lessor to pay, during each year of said term, all taxes, rates, charges, and assessments, ordinary and extraordinary, which may be lawfully imposed or assessed in any way upon the lessor or lessee with reference to the premises and property hereby demised, the capital stock of the lessor, its indebtedness, franchises, and revenues, or said rental; said payments to be made to the authority or treasurer entitled by law to receive the same, whether such law be of the United States, the State of Connecticut, or that of any State in which the said railroad is now built or in which said lessor may hereafter build or acquire further lines of railroad, or any municipal corporation of or in said States, so that the said lessor shall be saved harmless, during the continuance of this lease, from any such tax, assessment, or charge under laws or proceedings made or authorized by the United States, or the State of Connecticut, or any other State in which said railroad or its branches or extensions are or may be located; and if any taxes or assessments shall be levied against the individual holders of the stock or bonds of the lessor in lieu of or upon the lessor itself, its railroad and premises, the same shall be paid by the lessee.

*Provided*, That if any of said payments shall not be made within ninety days from the time when the same becomes payable, or if other default be made for ninety days in the performance of any of the covenants of the lessee in this indenture contained, and shall be thereafter continued for ninety days after written notice of such default has been given to it by the lessor, then this lease shall expire and terminate at the option of the lessor, which may re-enter upon the demised premises, and the same have and possess as of its former estate.

The lessee was to operate and maintain the property in good condition and so deliver it at the end of the term, subject to a minimum valuation, which the taxpayer might elect to take in cash or railroad equipment. The taxpayer was to pay the lessee for betterments and improvements. The lessee was to indemnify the taxpayer against suits, etc., by reason of the lessee's acts, the lessee was to make any required returns, and the lessee was to fulfill the taxpayer's contracts. The lessee assumed all the taxpayer's floating and unsecured indebtedness. The taxpayer was to keep its corporate organization, and to condemn property at the lessee's request and expense; and similarly to construct new branches and extensions. The taxpayer would comply with the request of the lessee to issue new stock and execute mortgages, and would not do so except with the lessee's consent and at its direction.

Thereafter at various times at the request of the New England the taxpayer increased its stock and issued new shares and also acquired land and constructed extensions.

In 1919 the New England paid to the United States an amount of $6,884.59 income tax for 1918 upon the net income returned by the taxpayer of $59,371.55. This amount of $6,884.59 was treated by the Commissioner as additional income of the taxpayer in 1918, with the result that he determined the deficiency in question of $826.15.

It is stipulated that if the taxpayer and the New Haven are affiliated there is no deficiency.

### DECISION.

The deficiency determined by the Commissioner is disallowed.

### OPINION.

STERNHAGEN: The question first to be determined is whether the taxpayer was affiliated with the New Haven, that is, whether the New Haven owned directly or controlled through closely affiliated interests substantially all the stock of the taxpayer. It owned directly 58.9 per cent of the shares. It owned 99.9 per cent of the stock of the New England, and hence it can not be doubted that the New England was a closely affiliated interest of the New Haven. Whatever relation existed between the New England and the taxpayer may therefore be properly treated for the purposes of this statute as applying to the New Haven. The question thus becomes one to determine whether the contract of 1890 and the ownership of 17,482 shares, together with the other facts found, bring the two corporations into the statutory affiliation.

The contract is not a mere lease by which a lessor lets its property to a lessee for a rental. It is a virtual relinquishment by the taxpayer to the New Haven of its rights and powers as a subsisting business institution and places the New Haven in control of its destiny. Not only does the New Haven possess and operate the properties, it also may require the taxpayer to acquire more property and to mortgage them as the New Haven directs. All of the taxpayer's railroad business is out of its hands, including its operating income; and whatever franchises it acquired have been placed at the New Haven's disposal. That under these circumstances the New Haven actually controls the business and properties of the taxpayer is plain to be seen.

But it is said that this alone is not enough to bring the statute into operation, because the control of the business and properties is not the control of substantially all the stock. And it is true that in many cases the two are distinct. It does not follow from a lease of the entire properties of a corporation that the lessee can be said to control the stock. *Appeal of Old Colony R. R. Co.*, 1 B. T. A. 1067. There must be substantially more. Certainly there must be a common interest above that of the ordinary lessor in his rent and the preservation of his property. In the present case, however, it is contended that the existence of a substantial minority of outstanding stock should defeat affiliation. It is not shown that by any act such minority has or could frustrate any purpose or plan of the New

Haven, but, on the contrary, the insignificant number of minority shares which voted at the stockholders' meetings in 1917 and 1918 indicates an unobstructed control by the New Haven. Whatever the New Haven requested was done. And how could it be otherwise? The New Haven had the property and it also held sufficient votes to overcome any opposition to its management. Although theoretically the lessor had the right to enforce the terms of the lease and demand forfeiture or other remedy in default of any of the covenants, how was this to be accomplished if the New Haven resisted? Its officers controlled the properties and management, both as officers and directors of the taxpayer, and its majority of shares was behind these directors. The sum total of the affairs of the taxpayer was therefore in the hands of the New Haven.

All that the shares of stock represented to the minority holders was the right to receive dividends on their stock. And it may be questioned how that right was to be preserved in the event of financial failure of the New Haven. Even a minority stockholders' proceeding would hardly be adequate where the effectiveness of the business depends on its relation to the larger transportation system of which it is a part. When one corporation so far controls the property and affairs of the other as to leave in the minority stockholders nothing but a bare interest in a division of the rental, it is quibbling to say that the minority stock is not controlled. We must conclude that the New Haven owned directly or controlled substantially all the stock of the taxpayer, and that they were affiliated within the meaning of the statute.

Both parties refer to the decision of the Board in the *Appeal of Old Colony R. R. Co.*, 1 B. T. A. 1067, but the circumstances there were substantially different. There the lessee owned less than a majority of the lessor's stock and the other facts were not sufficient to indicate control.

Deciding as we do that the two corporations were affiliated, thus requiring a consolidated return, the second question disappears, for the payment by one of the tax of the other is an intercompany transaction and does not affect income. In view of the stipulation of the parties, the entire deficiency is disallowed.